IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| GOODRICH OPERATING CO., INC., et al., | § § § |
| Plaintiffs, | § § |
| v. | §   CIVIL ACTION NO. G-05-336 |
| BURNETT & CO., INC, et al., | § § § |
| Defendants. | § |

**ORDER GRANTING IN PART AND DENYING IN PART UNDERWRITERS' MOTION FOR SUMMARY JUDGMENT AND SUA SPONTE TRANSFERRING TO THE LAKE CHARLES DIVISION OF THE WESTERN DISTRICT OF LOUISIANA**

This case arises out of a dispute concerning insurance coverage for energy exploration and development. The Underwriters' for the policy have been joined as Defendants in this case. Now before the Court is the Underwriters' Motion for Summary Judgment. For the reasons outlined below, the Underwriters' Motion is **GRANTED IN PART AND DENIED IN PART**. Additionally, since this case has no connection to this District or Division, this case is **TRANSFERRED** to the Lake Charles Division of the Western District of Louisiana.[1]

**I. Background**

Plaintiffs Goodrich Operating Co., Inc. and Petrogulf III, L.L.C. entered into a lease with Miami Corporation pursuant to which, Plaintiffs developed a drilling plan. Pursuant to that plan, the Goodrich Miami Fee No. 1 Well ("Well") was spudded on January 31, 2001 and directionally drilled to a total depth of 14,307 feet in late March 2001. After the commencement of operations,

---

[1] The Court does not consider this Order worthy of publication. Accordingly, it has not requested and does not authorize publication.

perforating guns encountered an obstruction that prevented the guns from being lowered to the appropriate point. On April 17, 2001, a tubing unit was engaged to drill out the obstruction and clean out the Well. During the course of clean out, a well blowout occurred, likely as a result of an inadvertent hole being milled in the liner. Operations to successfully control the Well were completed on May 7, 2001. From January 22 through February 14, 2002, Plaintiffs performed workover operations to restore the Well to production.

Plaintiffs made three claims as a result of the incident describe above. The Underwriters for Plaintiffs' insurance policy paid an initial claim of $2,826,957. In mid-2002, Plaintiffs submitted a supplemental claim for $752,626.53 for costs allegedly incurred between January 22 and February 14, 2002. This supplemental claim was denied. A second supplemental claim was submitted on February 10, 2003 asking the Underwriters to reconsider their decision on the first supplemental claim. In addition, Plaintiffs sought recovery for an additional $865,300.00 associated with drilling a sidetrack well to complete production. The sidetrack well was never drilled. The Underwriters denied Plaintiffs' second supplemental claim.

## II. Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986). When one party moves for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 252, 106 S. Ct. at 2512. The mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 247-48, 106 S. Ct. at 2510.

Nevertheless, if the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513.

### III. Analysis

The Underwriters have moved for summary judgment on what can be narrowed down to three different grounds: (1) policy conditions apply to preclude coverage; (2) Plaintiffs cannot prove all elements required for estoppel; and (3) Plaintiffs' claims for Insurance Code violations and bad faith are barred by the applicable statute of limitations. Plaintiffs vigorously dispute each of the Underwriters' arguments, and the Court will consider each in turn.

**A. Policy Conditions Precluding Coverage**

*1. Well Safely Diverted to Production*

First, the Underwriters argue that the policy precludes coverage since the Well was "safely diverted into production." Section B, Redrilling/Extra Expense, subsection 1.b. of the policy reads as follows:

> There shall be no coverage under Section B for restoration or redrilling of any well whose flow can be safely diverted into production, including by completing through drill stem left in the well insured hereunder, or which can be completed through a relief well(s) drilled for the purpose of controlling a well.

Plaintiffs do not dispute the validity of the provision. Rather, they argue that it is inapplicable to the events as they occurred. Namely, Plaintiffs argue that "safely diverted into production" is not defined

in the policy and that the well was in fact not "safely diverted into production." Plaintiffs note that

> High pressure down hole combined with damage to the on-site rig and surface equipment created an ongoing danger to both the individuals working on the Well and to the environment. Plaintiffs made the decision to attempt to flow the Well to production because it was the only feasible method of decreasing the dangerous down-hole pressure. . . It is also important to note that the flow from the well was coming from the open hole and not exclusively through the production casing. The drilling industry standard for safe production requires that production come through the production casing and not through the open hole. Production through the casing provides the operator with the ability to shut in the well using blow-out preventers and other well control mechanisms to control flow from the well as necessary. Producing from an open hole may significantly inhibit the use of such control and safety mechanisms.

Response at 5-6. The Underwriters counter with deposition testimony discussing the diversion process in which James Perkins, Goodrich's corporate representative made the following statements: (1) "we knew we could do it," (2) "it was easy to divert to production," (3) "I don't think it created any greater risk," and (4) "it was not an unsafe operation to divert the well to production." *See* Motion at 7.

This type of swearing match depends on weighing evidence and determining witness credibility and is suitable for resolution by the trier of fact. Summary judgment at this stage on this ground is inappropriate.

### 2. *Indemnity Policy*

The Underwriters' second argument is that the estimated cost of $856,300 for drilling a sidetrack well included in Plaintiffs' second Supplemental Claim is not covered since the Policy is one of indemnity, and those costs have not yet been incurred. Regarding coverage for redrilling, the Policy states that the Underwriters agree to reimburse for "actual costs and/or expenses reasonable incurred to restore or redrill a well." Since the $856,300 has not been incurred, the Underwriters argue that it is not subject to reimbursement. Plaintiffs' only argument in response is that

underwriters in the industry routinely pay covered claims before they are actually incurred in order to allow insureds to make necessary repairs without fear that the claims will later be denied.

The arrangement proposed by Plaintiffs makes sense to the Court from an efficiency standpoint, and the Parties could have written their policy to provide for approval of expenses before they are actually incurred. However, the Policy here was not written in such a way and is unambiguous. The Underwriters are within their legal rights to enforce the contract as written. Therefore, the Court agrees that the Policy precludes coverage for the anticipated costs included in the second supplemental claim.

### *3. Restoration Commenced Outside Allowable Time Period*

The Underwriters' next argument is that the second supplemental claim for restoration costs is precluded since restoration was not commenced within 540 days from either the date of the blowout of the expiration of the Policy. In pertinent part, the Policy reads:

> In any circumstances, Underwriters' liability under section B for costs and expenses shall cease (1) if actual restoration or redrilling has not commenced within 540 days after (a) the date of the accident or occurrence giving rise to coverage under section B or (b) the date of the cancellation or expiry of this policy, whichever shall later occur.

The blowout occurred on May 4, 2001 and the Policy expired on either March 1, 2003 or March 1, 2002.[2] Accordingly, the latest possible date that Plaintiffs could have commenced restoration operations was August 23, 2004. The estimated costs for the sidetrack well included in Plaintiffs' second supplemental claim have not been incurred to date, so there is no question that they are outside the 540 day limit. Again, Plaintiffs argue that this type of time limit is often waived in the industry. However, as analyzed above, the language of the contract is clear and it is the

---

[2]Plaintiffs state that the Policy expired on March 1, 2003, while Defendants state that it expired on March 1, 2002. Since there is no proof offered for either date, and it is of no relevance to the instant analysis, the Court will not pursue the resolution of this discrepancy.

Underwriters' prerogative to enforce the terms of the Policy as written. Accordingly, the Court agrees with the Underwriters that the above-quoted provision of the Policy precludes Plaintiffs' second supplemental claim for drilling the sidetrack well.

**B. Estoppel**

Plaintiffs' claim for estoppel relates to the workover activities in January and February of 2002. These costs were included in Plaintiffs' first supplemental claim and resubmitted along with additional claims in Plaintiffs' second supplemental claim. Plaintiffs basically argue that they incurred the disputed $752,625.53 based on representations by Underwriters' agents that the costs would be covered. The Underwriters argue that the first meeting to discuss these costs was not until after they had already been incurred, so Plaintiffs could not possibly have relied on any statement made by the Underwriters or their agents in deciding whether to commence with the repairs. Plaintiffs argue that this simply is not true. The Court finds that at this stage in the litigation there are simply too many questions of fact to resolve Plaintiffs' estoppel claims.

**C. Transfer**

During its analysis of this Motion the Court found that this case has absolutely no connection to the Galveston Division of the Southern District of Texas. The blowout did not occur here, and the Parties are not located here. The residents of this Division have little, if any, interest in the resolution of this case. It would more properly proceed in the Lake Charles Division of the Western District of Louisiana, where the incident occurred. Accordingly, the Court *sua sponte* transfers the case that Court.

**D. Limitations**

The Underwriters also argue that Plaintiffs' claims for bad faith and for violations of the Texas Insurance Code are barred by the applicable two year statutes of limitations. This Court finds that

the transferee Court is better equipped to answer questions of limitations, now that this case will proceed in another state. Accordingly, it leaves this issue open for the Parties to brief to the transferee Court.

## IV. Conclusion

For the reasons outlined above, Underwriters' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**, and this case is **TRANSFERRED** to the Lake Charles Division of the Western District of Louisiana. Plaintiffs' claim for $865,300 to drill a future sidetrack well are **DISMISSED WITH PREJUDICE**. All other claims remain. All Parties are to bear their own taxable costs, expenses, and attorneys' fees incurred herein to date.

**IT IS SO ORDERED**.

**DONE** this 24th day of April, 2006, at Galveston, Texas.

_____
Samuel B. Kent
United States District Judge